All right. Good morning, Council. Our next case is Crittenden v. LeBlanc, and we'll first hear from the defendants. Whenever you're ready, Council. Good morning, Your Honors, and may it please the Court. My name is Ben Wallace, and I represent the appellants in this case, Jimmy LeBlanc, Perry Stagg, and Angela Griffin. They were, at all relevant times, supervisors in Louisiana's Department of Public Safety and Corrections. They were sued in this case in their individual capacities only for money damages under Section 1983. I'd like to begin by focusing on what we think was the district court's key legal error in this case, and that was framing the applicable, clearly established law for the qualified immunity context too generally. This despite repeated admonitions from both the Supreme Court and this Court that the applicable law should be framed with specificity and in context with the particular conduct of the defendants in the case. Here, that's not what happened, and so we think that the district court erred as a matter of law in denying each individual qualified immunity on each of the claims that they face, and we ask this Court to reverse the district court's judgment and hold that each individual appellant, who were all defendants below, are entitled to qualified immunity. I'd like to go actually claim by claim and explain where the district court's key legal errors were for each claim in this case, and I think it would help just to explain there are sort of two groups of claims that the plaintiffs have in this case. They're all supervisory liability claims under Section 1983, but they fall into two groups. One is what's referred to as the direct participation claims, and the others are what's referred to as failure to adopt policy claims, and I'd like to start with the direct participation claims. On that issue where you're going, I have sort of a preliminary question, so I'll ask before you dig into the details. When I read the district court's opinion, it's strange on this issue because the plaintiff sought summary judgment on the direct participation, and she denies the plaintiff's motion for summary judgment with some language that I think could be read to say not just that they're not entitled to summary judgment, but that they don't state a claim at all on that particular claim, and she does not explicitly in that part of the opinion rule on your motion for summary judgment on direct participation, but then I think both you and the other side are assuming she denied your motion because at the end of her opinion, she just denies the defendant's motion in total. It seems to me it's a little ambiguous whether she just was forgetting about your motion on that issue. My question is should we do a limited remand and ask her what her ruling actually was on your motion on direct participation? Your Honor, you have it exactly right in terms of what happened, but no, there should not be a limited remand because we think it's clear from the district court's language that the undisputed record shows on these direct participation claims that what each appellant did was reasonable, and I'm looking at pages 70. I guess what I'm saying is maybe that's what the district court thought, and if that's true, the issue wouldn't be before us because there's no interlocutory appeal of a grant in favor of the defendants on some claims, unlike the denial of qualified immunities, but you would just be asking the court to clarify its rule, and you don't think that's warranted. No, Your Honor, I don't think it's necessary because the court at the end of the day denied each individual appellant's motion for summary judgment, denied them qualified immunity in their entirety, even though they clearly sought qualified immunity on these direct participation claims, and you can find that at pages 5, 7, 4, 8 of the record and 5, 7, 6, 3 to 5, 7, 7, 0. That's from the defendant's motion for summary judgment where we went plaintiff by plaintiff and explained why each individual defendant was entitled to qualified immunity on these direct participation claims, and I see the language that you're referring to, Your Honor. This is on page 73 of the appellant's record excerpts. It's also page 10569 of the record. The evidence in the record demonstrates that after they became aware of the issue, defendants communicated with the relevant parties to obtain the necessary paperwork, calculate a release date, and release the plaintiffs. We think the language basically couldn't be clear enough for this court to rely on in terms of what the undisputed record shows happen below. Beyond that, Your Honor, the issue is squarely presented before this court. We ask this court to reverse the district court's judgment, and this is an issue of law, purely an issue of law that's properly before this court on this interlocutory appeal. So I'd like to move on, actually, to the failure to adopt policy claims, which take up most of the district court's opinion and largely a good portion of the briefing in this case, and there's two groups of claims. One is leveled against Secretary Jimmy LeBlanc and the other, a man who was then Deputy Assistant Secretary Perry Stagg, And what the plaintiffs allege is that they were deliberately indifferent in failing to adopt a policy to include in what's called the basic jail guidelines, which is a formal partnership that the Louisiana Sheriff's Association has with local sheriffs that sort of helps manage the custody arrangements of state inmates in local jails. So what the plaintiffs say in this case is the individual defendant should have adopted a policy in those basic jail guidelines that required sheriffs to transmit necessary information that's necessary to calculate an inmate's release date by a certain deadline. There are a couple of problems with this recommendation. As the district court recognized, during Secretary LeBlanc's deposition, the plaintiffs questioned him extensively about this recommendation and said, Why haven't you done this? You should have done this. This would have helped prevent what happened in this case. Initially, Secretary LeBlanc says, you know, I'm not quite sure why we've done this. It would be a good idea. And then he goes on to clarify his answer and say, you know, at the end of the day, I'm not sure that such a policy would be enforceable. And he's right as a matter of law. Basically, the reason it wouldn't potentially be enforceable, there's a couple of reasons. And the biggest is that the sheriffs themselves, one, are not controlled by the Department of Corrections. They are constitutionally in Louisiana control of their own parishes and they control the inmates in their custody. But more importantly, they have to gather certain information themselves statutorily from clerks of court. This includes the Uniform Sentencing Order. It's called the Uniform Commitment Order and the Bill of Information. The sheriffs are statutorily charged with collecting that information and giving it to the Department of Corrections. So if the Department of Corrections were to include in the basic jail guidelines a policy like this and include a deadline of say, hey, transmit this within one day of sentencing, the sheriffs would then be forced to hold the clerks of court responsible for turning that same information around immediately. Can I ask a question, sir? Yes, Your Honor. You have the Clean Six Study, the 2012 classification study, and very significant findings, sweeping findings. And four years later, four years down the road, they came up with a spreadsheet and a fiasco, as they call it, where 57 prisoners at River Bend had paperwork, et cetera, et cetera. And then a month goes by before they get the best of their paperwork. One of the concerns I have jumps out at me is the pervasive availability of this information to the people here who were participants. You say, well, they couldn't have done anything about it. Who could have? And in other words, there is a complete failure here collectively as somebody to address this problem. But you have people that were not even sentenced to jail time that are kept, et cetera, et cetera. But what you're saying is that, well, these particular defendants here couldn't do this. Who could? Your Honor, what was supposed to happen in this case is that the sheriff's office of Orleans Parish should have done one of two different things. Either it should have brought these inmates to a state facility where they could have been processed. And this paperwork could have been ensured that they were that it was collected before they were eventually transported to a different local jail to do their time. Or they could have the sheriff's office Orleans Parish could have collected this paperwork as they were statutorily supposed to, and then sent it to the Department of Corrections before transporting these individuals from Orleans Parish, where they were sentenced up to East Carroll Parish in the northwest corner of the state where they were doing their state time. So in terms of who could have who was in the best position to prevent this from happening, I think the answer is not even the block nurse tag. We're in a position to do anything about this. No, Your Honor. At the end of the day, they really weren't this particular problem in this case. It was it was basically out of their hands. The problem is what was happening with each of these five plaintiffs in this case was that they were detained pretrial on various charges of various seriousness. And Orleans Parish, because they had a housing problem of their own in their Orleans Justice Center, local jail. They had transported the prisoners or sorry, the inmates to East Carroll Parish Riverman Detention Center before they were even sentenced. So they were doing pretrial time in East Carroll Parish. The Department of Corrections has no way of knowing about these people because they haven't been sentenced yet. One day there on various days, each individual is brought down sentence. And in most cases, either immediately or within a few days transported back up to East Carroll Parish. If the question is, how is the Department of Corrections supposed to find out about these people? The answer is the sheriff's office is statutory obligated to tell them. And that's how the system is supposed to work. They knew that they weren't getting that information. Allegation. Well, but the record is undisputed that they didn't get that information. They didn't. I looked at the secretary of the department. He oversees the policy department responsible for ensuring that DPSC only detains the people that has authority to hold and that people are released from custody when they no longer make it. Stag was the deputy assistant secretary throughout this period. He oversaw the pre classifications of persons, etc., etc. With LeBlanc, Stag determined the content of the basic jail guidelines, the government operation of the prison itself. So they moved back and forth from the county to the state. There's a breakdown here and a very serious failure. We start with that. And I don't think that that's really can be contested. But then the question, the finger pointing is who and what we're getting is not me. Yet these people hold their titles and their assignment, apparently significant power and control and nothing happened. Help me with that. I have trouble saying that there's nothing they could do. Yes, your honor, I think under the facts of this case, it would have been the policy that the plaintiffs have proposed that the secretary LeBlanc and deputy assistant secretary Stag should have adopted. It would not have made a difference. And in Porter versus Epps, this court said a failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights. That's at page 446 of that opinion here. It wasn't obvious that failing to include this particular provision in the basic jail guidelines would lead to a violation of constitutional rights because it maybe wouldn't have even made a difference. The problem is the sheriffs were already obligated to do this. And in this particular case, they weren't doing it. So, your honor, you referenced the Lean Six Sigma study in 2012. And I think it's important to focus on what that study was about and what it wasn't about. What the study was about was improving the internal processes of the Department of Corrections to help manage the time calculation process for inmates. So, I'm looking at page 9052 and 9053 of the record on appeal. These are a couple of PowerPoint slides from that study, and it includes recommendations of what the Department of Corrections should do to try to fix some of the issues that were going on at the time. The first one, locate a specialized pre-classification central office at headquarters to perform all tasks and avoid distractions to workflow. That happened. Angela Griffin testified to as much at page 5898 and 5899 of the record. Implement management routines as piloted in the project. That happened. Design supervision to provide direct accountability and consistency of procedures and training. That happened. Centralize the active files as well. That all happened. Page two, and this was stuff that was within the Department of Corrections' power to control, and so they controlled it. I'm now looking at page 9053 of the record. Revise legislative statute to eliminate the requirement for clerks of court to submit court minutes. That's not even something that the Department of Corrections has the power to do. Only the legislature can change the law. Nevertheless, that actually happened in 2017 in large part because Secretary LeBlanc lobbied for that change. Provide a resource for employees to reference. I'd like to go past your time, Mr. Wallace, but you'll also get five minutes for rebuttal, so we'll hear from you again. Yes, Your Honor. And, Ms. Washington, it's your turn. Yes, Your Honor. May it please the court, my name is Emily Washington, and I represent the plaintiffs who are the appellees here. Qualified immunity can offer no protection to those state actors who are plainly incompetent or who knowingly violate the law. I would like to start briefly with three points which have been undisputed since this case was filed in 2017 and remain undisputed on this appeal. First, the five plaintiffs were imprisoned for months beyond the date that each was legally entitled to release. Ms. Washington, how much of that time for each of the five plaintiffs is attributable to DPSC? It's our argument that all of the time is attributable to DPSC, which was actually my second point, Your Honor. And what is the power that DPSC has over the clerk's office of the courts in Orleans Parish? Our argument is that they have power over the sheriff's offices, which I believe opposing counsel was discussing. The basic jail guidelines that he referred to are much more than a partnership. They were agreed to in settlement of prior litigation against the Department of Corrections, and they were designed to ensure that DPSC sentenced prisoners, state prisoners, who are housed in parish jails, that their constitutional rights are ensured by that arrangement. And so the basic jail guidelines are governing over the sheriff's offices. And so through those... And you sued the sheriff, obviously, and settled with the sheriff. So we're only here today to talk to DPSC. And before we get too far down the road, I just want to make sure I understand, because this came up in some of Judge Higginbotham's questions. I just want to make sure I understand the record as it exists. I'm looking at your five plaintiffs, Crittenden, Burse, Copeland, Dominick, Guidry, and I'm seeing the date that the DPSC received the information for the release and the release date. So if we go in that order, it's one day difference, two days difference, zero days difference, one day different, zero day different. So across the five plaintiffs, the amount attributable between when DPSC receives the information and when the prisoner is released is a total of, what is that, four days? Is that right? Yes, Your Honor, that's correct. Okay. So that's the amount that would be attributable to DPSC. And whatever else happened with respect to the release information, it was before it was given to DPSC. Am I misunderstanding what you're saying? That's correct. That is not our argument. So by Louisiana law, each plaintiff is placed into the legal custody of the Department of Corrections at the time of his felony conviction. And so as a result, for the entirety of the period of overdetention that's been admitted in this case, the DPSC defendants were the legal custodians of the plaintiffs, and the defendants do not dispute that. Maybe this is the way I'm getting confused. Can you help me understand? What is your understanding of the constitutional right that DPSC violated? How would you articulate the constitutional right at issue? Sure. It's the right under the 14th Amendment that jailers ensure the timely release of prisoners. The timely release of prisoners who are not in their custody. Who are in their custody. But using information that they don't have. It's our argument that they should have had that information. So DPSC is solely responsible for performing the initial time computation for all persons given a hard labor or felony sentence, including those held for the department in parish jails. And that the department is also obligated to issue the release of each of these individuals based on the department's time-like calculation. So these are the ministerial, non-discretionary functions of the DPSC officials, such as these defendants. So we talked a lot about the LSS study that seems to be a counter, sort of a cornerstone of the plaintiff's argument on appeal. And I'm looking at page 9033, which I take to be the sort of centerpiece of your deliberate indifference argument. This is where the LSS study acknowledges the various delays in the – it's called process, map, and cycle time. These are the various delays and we're computing the time. And there are basically three pieces to this. There's the time between the clerk and the jail, which at the time of the study is 19.6 days. Between the jail and the pre-class facility at the time of the study, that's 11.45 days. And then from the plea crafts facility to the ready for transfer, which I take to be the DPSC delay, is 7.27 days. So I take it that your argument is that the deliberate indifference associated with DPSC is they chose to focus on getting 7.27 down to zero or one, which is what it sounds like they've done in this case, as opposed to focusing on the clerk of court and the 19.6 days that the clerk of court took to transfer them to the jail? Yes, Your Honor. It's our argument that they needed to address all of that. So as you note, at the bottom of slide eight there, it says, quote, while there does seem to be delays between the clerks and the jail to us, our approach was to focus on minimizing RCT or cycle time before addressing it with the outside agencies. And it's our contention that this statement by the department is the very definition of deliberate indifference to prisoner's right to timely release. Why would it be deliberately indifferent to start with a thing that the DPSC can control? It may not have been to start with that, but the problem is that they never got to the other piece, as they say here, before addressing it. The problem is that they have never addressed it. And it's actually the defendant's contention here. They don't actually address the specific policy deficits that we have pointed to. It's their contention that they were they basically had to do nothing because they were allegedly unaware that delays and obtaining sentencing information from the local jurisdictions was a cause of over detention. And that's just simply. Do you dispute that the sheriff's office has a statutory obligation to provide this information? We do not dispute that. I agree that there are overlapping statutory obligations here. There is an obligation on the sheriff to transmit information, but there's also an obligation on the Department of Corrections from the minute that all of these individuals enter their legal custody, which is at sentencing to both know of these individuals who have been sentenced to their custody and to process those people's time and issue their releases. It really confuses me because if this sheriff has a statutory obligation to provide the information, then what in the world would a jail guideline do that the statutory obligation didn't do? So the statutory obligation doesn't include a time frame specific to when to provide the documents. I'll say that in the basic jail guidelines also doesn't provide that. It's our contention that the plaintiffs are responsible for identifying deficiencies in their policies and processes, the known result of which is the constitutional violation and that we have done that. And it's our contention that there may be any number of ways that the DPS and C could design to fulfill their statutory and constitutional obligations and resolve these policy deficits. But the department may not simply decline to enact policies to ensure that they timely release people sentenced to their custody. And that is what these defendants have done. And it's on the basis of that that we argue that and have shown that these defendants are deliberately indifferent and aren't entitled to qualified immunity on the failure to enact policy claims. And this was the ruling of the district court. And it's our contention that it should be affirmed on this appeal. So I'm looking at Mr. Copeland and his sentence end date was October 14th, 2016. He wasn't released until January 13th of 17. So his sentence end dates on October 14. Could Mr. Copeland have filed a habeas application to be released from prison on October 15th, the day after his sentence ended? I would contend that he could have. We, in fact, did file a habeas for Mr. Copeland in January, which was, I believe, around January 12th. And his release was shortly thereafter. We filed. Did you file these applications for any of the others? We did for Mr. Crittenden, I believe. And for Mr. Copeland, we intended to for Mr. Burst. But he was actually released shortly before we filed it. And so I'm curious why that doesn't end this case. Because if you had a remedy in habeas, then why is it not all HEC part? The remedy in habeas would have been only for the release, not as to the damages. All that is being contested here in this case is damages for the violations by these defendants. And the issue. I'm sorry. I'm sorry. I was just going to speak to HEC. So the issue of HEC has been raised by these defendants in the court below and was denied and is not before this court on appeal. I'm curious what would be the legal authority for the idea that something could be remediable in habeas at time one. But then the exact same injury would be remediable under 1983 and money damages at time two. Well, at the time of the habeas filing, they were currently imprisoned. And so the habeas action was just to secure the release. Could you have gotten money damages while they were still in jail? I'd have to think about that. I'm not sure. HEC specifically says you can't. Right. So if you can get if you can get habeas relief, that's mutually exclusive of your ability for the same injury to get money damages. And we have precedent that goes back 30 years. It says that it does. In fact, it's based on a footnote in HEC itself that says if you can remedy it in habeas, you can't remediate money damages. And it doesn't matter that you bring the money damages claim after the release of custody. We we've we've contended in this case that that HEC is just totally inapplicable here. And that was the finding of the district court below. And so we're not even contemplating what the implication of HEC would be. Oh, no, I am. And that's why I was asking. I understand. But it sounds like you don't have an answer to that. We don't believe that HEC is implicated in this case. There's nothing about this case, which is a challenge to these plaintiffs convictions. In fact, they are the ones who are perfectly comfortable acknowledging their convictions and the length of their sentence. This is a challenge to them being held and falsely imprisoned for dates beyond the date on which they were legally entitled to release. And because of that, HEC is not implicated in this case. I would like to turn. Briefly. To a couple of other things related to the deliberate indifference of these defendants as to the failure to enact policy claim. We discussed the Lean Six Sigma study briefly, but I would also direct the court to the defendant's testimony in their depositions, in which each of them express knowledge of the Lean Six Sigma study and of overdetentions that were caused by delays in the department obtaining information used in time computations, which is the exact issue in this case. And I would also direct the court to the defendant's statements of facts in briefing on the motions for summary judgment, as those are also instructive. For example, the defendant stated, quote, the 2012 LSS study analyzed the entire process from sentencing to release. Therefore, delays occurring prior to receipt of paperwork by DOC was part of the calculation. This is the plaintiff's record excerpts at page 19. The defendants also provided, quote, the 2012 Lean Six Sigma study identified delays in steps prior to DOC receiving paperwork. Again, this is the plaintiff's record excerpts at pages 19 to 20. And as I noted earlier, the defendants have not addressed the specific policy deficits that the plaintiffs have identified. Rather, they've argued that they were under no obligation to implement policies of any sort to ensure the timely release of prisoners where they allegedly did not have sufficient notice of this cause of overdetention. But as the district court recognized, the proverbial buck stops with the DOC. The department is obligated by state law and the federal constitution to perform the time calculation and issue the release for each individual sentenced to their legal custody. And if I could turn briefly to the direct participation claims, which were discussed by opposing counsel. The defendants are also not entitled to qualified immunity on plaintiff's claim that they directly participated in the violation of plaintiff's due process rights. In November of 2016, and no later than December 8, 2016, the defendants knew that DPS and C sentenced prisoners, including the plaintiffs, were at risk of overdetention as their initial time had not been calculated for months after their convictions, nor their release dates issued. The department's own documents show repeated outreach by the mothers of plaintiffs Crittenden and Burse. And defendants Stagg and Griffin each received this information and did nothing meaningful to secure the plaintiff's release. Defendant Stagg testified that as of December 8, 2016, he knew there was, quote, a systematic problem of DOC prisoners without paperwork held in East Carroll from Orleans Parish. Despite this, defendant Stagg testified that the department merely established a line of communication with an Orleans Parish Sheriff's Office employee. But the department took no other action to obtain any information or documentation they needed to calculate these individuals' time and issue their releases. The DPS and C defendants merely continued to wait. To the extent there's a genuine issue of material fact, whether defendants acted with deliberate indifference when they failed to remedy the unlawful detention of the plaintiffs for an additional month after the full scope of this fiasco was known, summary judgment is precluded. The defendants are not entitled to qualified immunity on plaintiff's direct participation claims, and these claims should proceed to trial as the district court held. And before I conclude, I just want to speak briefly to the clearly established law, which was mentioned by opposing counsel in his argument. This court's rulings in Wuerl, Bryan, Duthitt, Terry, and Porter from 1968 through 2011 have all held that there is a clearly established right to timely release from prison and that imprisonment beyond the date one is entitled to release implicates the 14th Amendment's due process clause. Wuerl specifically rejected the notion that the failure of a jailer to make necessary inquiries in order to affect the timely release of a prisoner could be excused by lack of communication with others in the criminal justice system, noting that ignorance and alibis by a jailer should not vitiate the rights of a man entitled to his freedom. In conclusion, this court has emphasized that a game of who has the paper and who saw the paper is not constitutionally playable. It has long been established that jailers must ensure a prisoner's right to timely release, and this court has continued to find that where there is no discretion and relatively little time pressure, a jailer will be held to a high level of reasonableness as to his own actions. The district court's denial of the DPSNC defendant's motion for summary judgment on qualified immunity was correct. We ask this court to affirm that ruling. If there's no further questions from the court, I will give up the rest of my time. All right, thank you, counsel. Thank you. Mr. Wallace, your five minutes for rebuttal. Yes, Your Honor. I'd like to start where my colleague left off, talking about the relevant Fifth Circuit cases that you just cited, Worrell, Bryan, Douthat, Terry, and Porter. What those cases have in common is that not a single one of them resulted in individual liability for a state prison official whose alleged fault was not forcing a sheriff to do something that it basically lacked the power to force them to do. In fact, in every single one of those cases, if there was a state prison official who was a defendant, the court granted them qualified immunity. And I'll start going back as old as Worrell. The other problem with these cases is that a lot of their reasoning has since been rejected. In Bryan v. Jones, the 1976 En Bant case, this court said basically that the continued vitality of Worrell, I believe this is at page 1214 of the opinion, in Bryan v. Jones, the continued vitality of Worrell is questionable given developments of Supreme Court law. Also in Bryan v. Jones, here's some important language. The court said in a case such as this one where there's no discretion and relatively little time pressure, the jailer will be held to a high level of reasonableness. If he negligently establishes a record-keeping system in which errors of this kind are likely, he will be held liable. But if the errors take place outside of his realm of responsibility, he cannot be found liable because he has acted reasonably in good faith. Two things about this language, Your Honor. The district court actually cited this language. This is at page 10565 of the record and page 69 of appellant's record excerpts. The district court said, moreover, the Fifth Circuit has explained if the jailer negligently establishes a record-keeping system in which errors of this kind are likely, he will be held liable. That is not good law. And now Chief Judge Owen made this clear in her concurrence in Porter v. Epps. She went out of her way to say in light of this – in this court's opinion, and Brian, this is at page 449 of Porter v. Epps. She quotes the negligent language and says in light of subsequent Supreme Court decisions, this is not a correct statement of law. It wasn't a correct statement then and it wasn't – and it isn't a correct statement now. And it's made even more clear by all of the wealth of Supreme Court cases that have said the applicable level of clearly established law should not be defined at a high level of generality. I'm now going to look at Cunningham v. Caslew, which is a 2020 decision from this court where this exact issue was teed up. And the court said – I'm looking at page 193 of that opinion. Courts must frame the question with specificity and granularity. The district court did not do that. Instead, the district court appears to have asked whether generally the procedural due process right to a name-clearing hearing was clearly established. That wording is the wrong way to frame the question, as the Supreme Court has repeatedly told us. It then cited eight Supreme Court cases where the Supreme Court had reversed circuit courts for doing just that, which is exactly what the district court did here. The ultimate question is whether each individual appellant was – their conduct was objectively reasonable under clearly established law defined at the appropriate level of specificity. Here it was on the undisputed factual record. On the direct participation claims, once the issues were brought to each person's attention, each person acted. It bears mentioning that Secretary LeBlanc had absolutely no involvement in the direct participation at all. And so, I mean, as to him, it's abundantly clear that he should be entitled to qualified immunity on those claims. But on the failure to adopt policy claims, the same result should – this court should reach the same result. On the failure to adopt policy against LeBlanc and Stagg, I've already explained adopting that policy may not have made a difference. I'd like to actually also point out a couple of other things the district court did real quick. The district court cited to a 2017 audit of the Louisiana auditor that said – that recommended adopting a change. The problem was that audit came out in October 2017. And the district court said defendant's failure – I'm looking at page 10563. Defendant's failure to implement a deadline even after such a policy was suggested clearly demonstrates deliberate indifference. Well, it was suggested to them long after. Your Honor, I'll briefly conclude by asking that this court reverse the district court's judgment and hold that each individual appellant is entitled to qualified immunity. Thank you for your time. All right. Thank you, counsel. The case is submitted and counsel may be excused.